# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MICHAEL ALAN YOCOM,

                Petitioner,

   v.

RANDY GROUNDS,

                Respondent.

_____/

1:09-cv-01150-SMS (HC)

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DIRECTING CLERK OF COURT TO ENTER JUDGMENT IN FAVOR OF RESPONDENT, AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

[Doc. 1]

     Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.  Local Rule 305(b).

<u>RELEVANT HISTORY</u>[2]

     Following a plea of no contest and a jury's determination that Petitioner was legally sane at the time of the crimes, Petitioner was convicted of grand theft (Cal. Penal Code[3] § 487(a)), receiving stolen property (§ 496(a)), and evading a police officer (Cal. Veh. Code § 2800.2(a)).  Petitioner was sentenced to state prison for five years and four months.  Petitioner appealed to the

---

[1] Respondent's counsel submits that Randy Grounds is the current warden at the Correctional Training Facility where Petitioner is currently in custody.  Therefore, the Court grants Respondent's request to substitute Randy Grounds as Respondent in place of Ben Curry.  <u>See</u> Fed. R. Civ. P. 25(d)(1); <u>Brittingham v. United States</u>, 982 F.2d 378, 379 (9th Cir. 1992).

[2] This information is derived from the state court documents lodged by Respondent on June 22, 2010.

[3] All further statutory references are to the California Penal Code unless otherwise indicated.

1

California Court of Appeal, Fifth Appellate District.  The Court of Appeal reversed the receiving

stolen property conviction and corrected the sentence accordingly.[4]  The judgment was affirmed

in all other respects.  On May 12, 2010, the California Supreme Court denied Petitioner's petition

for review.

On February 20, 2009, Petitioner filed a petition for writ of habeas corpus in the

California Supreme Court.  The petition was denied on July 22, 2009, with citation to In re

Dixon, 41 Cal.2d 756 (1953).

Petitioner filed the instant federal petition for writ of habeas corpus on July 1, 2009.

Respondent filed an answer to the petition on June 22, 2010, and Petitioner filed a traverse on

July 14, 2010.

## STATEMENT OF FACTS[5]

I.      Prosecution's Case

Between about 11:00 and 11:30 p.m. on March 6, 2008, various people in
Tulare saw and heard defendant outside their houses.

A. Tamra

Tamra heard noises in her yard. When she turned on her lights, she heard
someone running. She found her gate lock broken, a picket of her fence broken
off, and a water hose cart unhooked and moved.

B. Nick

Tamra's next-door neighbor, Nick, heard a noise outside. He saw a small
pickup parked with its lights off in the middle of the street, right next to his truck,
and he called the police. He saw a man walk from the truck to the side of the
house. Nick heard a loud noise then saw the man run back to his truck and drive
away with the lights off.

C. Chelsea and Ron

Chelsea was at Ron's house. She heard the dogs barking while Ron was
sleeping, so she went outside. She saw defendant standing near a small pickup,
which was near to Ron's truck. She asked defendant what he was doing. He
looked directly at her with surprise and tossed something into his truck. He
walked around the truck, got in and left. Chelsea ran into the house. Ron came

---

[4] The length of the sentence remained the same.

[5] The Court finds the Court of Appeal correctly summarized the facts in its January 27, 2010 opinion. (Lod.
Doc. 4.)  Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate
District.

2

outside and saw that his hydraulic puller (worth about $200) had been taken out of his truck bed. The entire encased set was gone, although some of the pieces had fallen on the ground.

D. Brian

Brian was not awakened that night, but the next morning he discovered his gate was open and a weed eater (worth $150 to $200), a leaf blower (worth about $110), a set of barbeque utensils (worth about $25), and a rack for a Jeep (worth about $50) were missing.

E. Corey, Curtis and Mark

Corey noticed a small pickup in front of his house and told his older brother, Curtis. Curtis told him to go outside and investigate. When Corey noticed a cut chain and lock and saw chain cutters on the ground, he ran back inside to get Curtis. Curtis noticed that their neighbor, Jim, had turned on his outside light. As the brothers stood in the front yard, they saw defendant crossing Jim's lawn, carrying a gas can toward the truck. Curtis cursed at defendant and scared him. As the brothers moved toward him, he put the gas can down and started to run away. After several steps, he stopped and pulled out a sharp object, and charged toward the brothers. At this point, the brothers backed away. Defendant mumbled at them and used foul language. He got in the truck, made a U-turn, and drove away with the lights off.

Curtis went inside and woke up their father, Mark. Curtis told him someone had tried to rob them. When they heard Corey yelling that defendant was back, they went outside. Defendant's truck, still with the lights off, had stalled in front of the house and he was struggling to start it. Curtis told Mark, "That's the guy, dad ." Mark went to the truck, opened the door, and tried to pull defendant out. Defendant resisted him, so Mark punched him two or three times. Defendant turned, looked at Mark, and said, "I'll cut you mother fucker." His eyes were big and focused and he spoke rapidly and directly. Mark tried to reach past defendant to get his keys, but he could not find them. Defendant got the truck in reverse and stepped on the gas, forcing Mark to run as fast as he could while trapped between the open door and the cab. Mark ran for 20 or 30 feet until he could move away from the truck. Defendant continued driving away in reverse.

F. Jim

Meanwhile, Jim heard a noise in his backyard, where he had two unlocked sheds, and his dog was acting strangely. Jim turned on the light and looked outside. He saw someone standing near his sheds. By the time Jim could open the sliding glass door, the person had left down the side of the yard. The sheds were open, some things had been pulled out, and a high pressure washer, worth $199, was missing. Jim later found the pressure washer on the side of his house, next to the unlocked gate. Jim went to his front yard and saw his neighbor, Corey, walking toward him with his gas can.

G. Law Enforcement

Officer Lopez received a dispatch regarding several burglaries in the neighborhood. Witnesses had described the truck and provided a partial license plate number. Lopez spotted a matching truck pull into the Fosters Freeze parking lot and turn its lights off. Lopez entered the lot from the opposite direction and the

two vehicles met facing each other. Lopez activated the overhead lights of his marked patrol vehicle. Defendant stopped the truck five to ten feet from the patrol vehicle.[FN3] As Lopez started to get out of the patrol vehicle, defendant put his truck in reverse and quickly backed away. As he did, he ran solidly into a tree, causing things to fly out of his truck bed. He put the truck into gear, his wheels screeching as he accelerated, and drove straight toward Lopez. As Lopez sat back down in the patrol vehicle, he thought defendant was going to hit him. At the last moment, defendant veered around the patrol vehicle, missing it by about one foot, and left the lot.

> FN3.  Lopez had had contact with defendant twice within the previous few months. Lopez made a U-turn, turned on his siren, and initiated his pursuit of defendant. Detective Jones and Officer Medina approached in another marked patrol vehicle as the two vehicles sped out of the parking lot. Medina activated the lights and siren and joined the pursuit through a residential neighborhood. Defendant drove onto a yard, spun out, and stalled. As the officers got out of their patrol vehicles and started to approach, defendant got the truck started and took off. The officers followed. After a wheel came off the truck, defendant drove into a field. He jumped out and ran toward State Route 99 (the freeway). The officers followed defendant over a fence and toward the freeway. Defendant ran down the freeway embankment and across the northbound lanes of the freeway, almost getting hit by a car in the fast lane. He stopped in the median in the oleander bushes. Medina reached him first and took him to the ground. Defendant resisted and they struggled. Jones arrived and told defendant he would use his taser if he did not comply. Defendant cursed at the officers and started to get up, so Jones used the taser. As he was being shocked, defendant yelled that the devil had a hold of him, or something to that effect. He was yelling all sorts of foul language and other strange things. Jones used his taser two more times and Medina struck him with his baton. Defendant never complied and the officers were required to use physical force to get him handcuffed.

Defendant's blood was drawn between 12:00 and 12:30 a.m., and was found to contain cocaine and its metabolites, morphine, and hydrocodone. Cocaine is a stimulant and both morphine and hydrocodone are narcotic opiate pain relievers. These drugs are often taken together. The levels found in defendant's blood would cause a person to be under the influence with symptoms such as a higher pain threshold and poor judgment.

Lopez returned to the Fosters Freeze parking lot and located a hydraulic puller and its case, a leaf blower, five shovels, a rake, a flashlight, and a box containing defendant's papers. Lopez photographed acceleration skid marks from defendant's tires.

A weed eater and a barbeque utensil set were found in defendant's truck.

II.     Defense Case

A. Officer Hastings

While Officer Hastings monitored defendant at the hospital, defendant made some strange statements about being chased by the devil before and during his apprehension by the police. Defendant was not hostile; he lay quietly.

B. Defendant

Defendant testified on his own behalf. He explained he had been under the care of a psychiatrist and a psychologist since 2003. He had been diagnosed as a bipolar schizophrenic. He took prescription Seroquel, lithium and Welbutrin to calm him, stabilize his moods, and relieve his depression. He had been convicted of a felony and had been to prison.

On March 6, 2008, defendant had not taken his medications for about one month. He had decided to quit taking them because he needed to get work. When he failed to take his medications, he would have racing thoughts that probably were not normal. On the night of the crimes, defendant was confused. He was receiving messages of guidance. He had used cocaine about 24 hours before he was arrested, but he did not remember taking anything else.

Defendant's memories of that night were "real sketchy" and "fleeting," but he had pieced it together by reading police reports. He did remember he was told to go to an exact location to get gas. Steve Smith, who owed him money, told him earlier that evening to go to a particular address to get gas in a gas can. But when defendant came out with the gas can, two "kids" were "yelling all kinds of shit, so [he] put the can down of the gas and [he] walked to [his] truck and got in [his] truck and [he] took off." He "didn't know what to think...." He "hesitated for a minute" and decided something was wrong and he had to leave. But after he left, he decided to go back to try to explain to the people and take them to Steve. Defendant thought he had done something wrong and he did not know it. He thought it had been a trap. He wanted to explain that he was not stealing. He did not want the police involved. Before he had the chance, however, Mark ran up to the truck and hit him several times. Defendant's foot was on the clutch and the truck started moving backward until defendant hit the brakes. He did not want to believe what was happening, so he left.

He was confused and was getting messages in his mind that someone was trying to do him wrong. Osiris, the devil's brother, was out to get everyone. The Centurions were the good people in that solar system. When defendant took his medication, he did not have as much contact with these people. Although at the very moment he was testifying, he was receiving messages. He had recently received a message that defense counsel and the prosecutor were brothers.

On the night of the crimes, defendant was driving his truck when he ran over a box in the middle of the road, causing his truck to skid. He got out and put the box in his truck. He was having problems that night. He was very confused-"it never had been this serious." He "ma[d]e it" to Fosters Freeze and wanted to get out of the truck. He did not recognize the officer as a policeman; instead, he thought he was an evil demon. The more defendant looked at him, the more he saw that his eyes glowed. Defendant put his truck in reverse and "just hit it." He ran into something, but he did not realize it was a tree.

At that point, defendant "had to get away" so he "took off." He did not remember the chase, but he remembered being on a curb, then getting back on the road and having a blowout. He remembered that when the officer used the taser, it felt like his teeth were melting together. He went to the hospital because Lopez broke his wrist. The next thing defendant remembered was being stripped and put in the rubber room at the jail.
Defendant was now back on his medications, but the jail personnel refused to give him an adequate dose.

On cross-examination, defendant testified he knew it was wrong to take someone's property. He also knew that a person is supposed to stop when the police approach with lights on. He had been arrested many times, so he knew that a person is not supposed to fight with the police when taken into custody.

On the night of the crimes, defendant went to one house only-the house Steve Smith told him about. Defendant never went into any back yard and he never stole anything. He did not open a shed and take out a pressure washer. He knew if he had done that, it would have been wrong. He would not steal because he did not want prison time. He did not touch a water hose; he was not there. He did not know how the items got into his truck bed because he put a black case in his truck. He would not take something out of someone's truck because that would be wrong and he knew it that night. But it was not wrong for him to have the items that belonged to him.

At the time defendant decided to go off his medications, he knew he was hearing voices. The voices intensified when he quit taking his medications. He knew there was some risk in his decision. Defendant communicated only with the Centurions. They would never tell him to take someone's property, "[b]ut then you never know." Defendant was unemployed when he decided to quit taking his medications, but he was trying to do whatever he could, such as recycling, mowing lawns, and trimming trees. That was why he had a blower, a weed eater, and other yard tools. People sold or gave them to him. Defendant needed money for a motel room, truck insurance, and gas. He was supporting his girlfriend, too.

Defendant had trouble remembering most of the events of March 6, 2008, but he did clearly remember he did not go to anyone's house and try to take any of their property. Even while hearing voices, he would know not to do that because it would put him back in prison.

Defendant explained that he returned after the gas can incident not because he felt bad, but because he knew one little "misunderstood" incident could put him back in prison, and he did not want to go back to prison.

Defendant thought his truck lights were on that night; he was not aware that they were off. He stopped at Fosters Freeze because he was confused and wanted to get out of his truck because he had never experienced the feelings and voices. Everything was "just such a confused mess" and he had been "socked in the face for no reason for three or four times."

The prosecutor asked defendant whether he saw the officer pull up in a marked patrol car. The following colloquy occurred:

"[DEFENDANT:] You know what, it's weird because you know it was, I believe, I believe, I believe-I thought it was a police car, but there was no lights on. There was no lights. And he was just sitting there looking at me. And he's-and I started looking at him and that's when I thought he was a demon and I put it in reverse.

"[THE PROSECUTOR:] So you did recognize at some point it was a police car.

"[DEFENDANT:] I, I, you know, it's, it's very-I mean I don't remember exactly. I'm just thinking, you know what I mean, because see, it's hard. It's hard when you read the police reports and

6

stuff when you ain't got a memory and you're reading police reports and you're trying to match it with the police report to make sure that's what happened, you know what I mean to be the-it's hard.

"[THE PROSECUTOR:] So as you sit here right now, you think you saw a police car that night.

"[DEFENDANT:] I thought it was a police car.

"[THE PROSECUTOR:] And it made you scared?

"[DEFENDANT:] Not really. A police car wouldn't make me scared. What made me scared and what made me put it in reverse and take off is because-was the fact that I thought he was a demon. I seen his eyes. I seen his eyes actually turn colors. I could actually see his eyes as he's sitting there looking at me. And if he's a policeman, why ain't he got his lights on or why ain't he pulling up next to me asking me what's going on, you know what I mean? He's just sitting there.

"[THE PROSECUTOR:] Okay.

"[DEFENDANT:] And I could see his eyes and he looked like a devil."

When the prosecutor pointed out that defendant had a clear memory of an officer swinging a baton and breaking his wrist, the following colloquy occurred:

"[DEFENDANT:] I feel it was Officer Lopez. I seen him there. I seen him there.... I'm, I'm-I mean I can't say one hundred percent it was Officer Lopez but I know Officer Lopez has already threatened my life. He's already made false accusations against me before and he's pulled me over several times for no reason, you know, without a citation. It's pretty bad when you get pulled over seven times without a citation, you know what I mean? Get your truck stripped all the way through with a fine tooth comb and nothing happened. They don't find nothing. Go on your way and then an hour later get pulled over again by them you know.

"[THE PROSECUTOR:] So you-

"[DEFENDANT:] That's bad.

"[THE PROSECUTOR:] -you saw Officer Lopez before. You know what he looks like. You remember him?

"[DEFENDANT:] Yes. I've seen several of the officers from the Tulare Police Department.

"[THE PROSECUTOR:] It sounds like you don't like Officer Lopez too much.

"[DEFENDANT:] No, I don't.

"[THE PROSECUTOR:] He's been harassing you?

"[DEFENDANT:] It ain't just harassment. He's evil. He's been assimilated."

C. Dr. Middleton

Dr. Middleton, a licensed psychologist, examined defendant at the jail on April 14, 2008, and determined he was insane at the time of the crimes. Dr. Middleton also reviewed defendant's history and the relevant police reports. Defendant explained to him his drug use, his criminal history, and his psychiatric problems. Defendant reported a history of bipolar disorder and schizophrenia. He complained that he was unable to stay on his medication. He said he heard voices, saw demons, and was unable to distinguish reality from his psychotic symptoms. Defendant believed he was doing the right thing on the night of the crimes. He believed the police had demonic eyes and were devils out to get him. He believed he had to evade them. Defendant recounted what the doctor described as a "believable history." Dr. Middleton did not believe defendant was faking his condition because he seemed truly distressed.

On cross-examination, Dr. Middleton stated he had learned all of defendant's mental history from defendant himself during the interview, which lasted between 60 and 90 minutes. Dr. Middleton requested defendant's mental health records from defense counsel, but he never received them. Similarly, Dr. Middleton received all of defendant's criminal history from defendant himself. Defendant told Dr. Middleton he had not used drugs that day.

D. Dr. Velosa

Dr. Velosa, a board certified psychiatrist, conducted an examination of defendant at the jail on April 1, 2008, that lasted between 60 and 90 minutes. Dr. Velosa reviewed five police reports. Dr. Velosa determined that defendant suffered from both schizophrenia and bipolar disorder, and that he was insane at the time of the crimes. He was out of touch with reality. He thought the police were demons and he was in danger, and these thoughts caused him to act irrationally.

On cross-examination, Dr. Velosa agreed that a person with schizophrenia is not necessarily legally insane, and that a person with a mental disorder could know it was wrong to steal if he was stealing to get more drugs. Dr. Velosa agreed it would have been helpful if he had known that defendant brought bolt cutters with him and had stolen property in his possession. Dr. Velosa also said defendant did not reveal he used cocaine the day of the crimes. In fact, defendant told him he had been drug-free for two and one-half years. Dr. Velosa agreed that defendant's delusions on the night of the crimes might have been caused by cocaine rather than a mental disorder, although Dr. Velosa did believe defendant suffered from a mental disorder. Dr. Velosa had not examined defendant's records; his evaluation of defendant was based on what defendant told him and what was included in the police reports.

DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

out of the Tulare County Superior Court, which is located within the jurisdiction of this Court.

28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

(1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.     Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-

Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that

the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that

contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are

materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown

v. Payton, 544 U.S. 133,  141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06

(2000).  A state court decision will involve an "unreasonable application of" federal law only if it

is "objectively unreasonable."  Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti,

537 U.S. 19, 24-25 (2002) (*per curiam*).  "A federal habeas court may not issue the writ simply

because that court concludes in its independent judgment that the relevant state court decision

applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations

omitted).  "Rather, that application must be objectively unreasonable." Id. (citations omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing

evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court

and based on a factual determination will not be overturned on factual grounds unless objectively

unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."

Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254

apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v.

Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion.  See Ylst v. Nunnemaker, 501

U.S. 979, 803 (1991).  However, where the state court decided an issue on the merits but

provided no reasoned decision, courts conduct "an independent review of the record . . . to

determine whether the state court [was objectively unreasonable] in its application of controlling

federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  "[A]lthough we

independently review the record, we still defer to the state court's ultimate decisions." Pirtle v.

Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

C.      Lack of Competence to Enter Valid Plea Agreement and Stand Trial

Petitioner raises three separate but related claims regarding his competency during the

trial proceedings: first, he claims the trial court should have held a competency hearing; second,

he claims there was insufficient evidence of his sanity at the time he committed the charged

offenses; and third, as a result of his alleged mental instability, his no contest plea was invalid.

The Court will address each claim separately.

1.      Failure to Conduct a Competency Hearing

Petitioner raised this claim on direct appeal to the California Court of Appeal which

denied the claim stating, in pertinent part:

10

On July 30, 2008, when defense counsel stated he was beginning to wonder if some section 1368 issues were arising, the court responded, "Well [defendant] appears to know what's going on," and counsel agreed, "He does.  He does."

The same day, when counsel submitted defendant's letters to the court, he said he thought defendant was starting to decompensate mentally.  The court stated:

"I appreciate your concerns, but the mere fact of the letter would indicate to me that he knows what's going on.  He now wants to withdraw his plea, and opt out of the plea agreement.  That's someone who certainly understands what's going on with the court proceedings. [¶] He knows who his lawyer is.  He wants a new lawyer."

Later the same day, the court made this statement on the record:

"I want to put an observation on the record only because of [defendant's] conduct and, and what's been happening here. [¶] I'm not convinced that [defendant's] actions are anything more than an attempt to manipulate the court and the system.  I think he is playing up his mental illness capacity or aspect because now we're in trial and I see it as my impression is a malingering type situation here to make his appearance or to make his mental illness appear to be much more serious than it really is for purposes of disrupting this proceeding. That's just—I'm not a [m]ental [h]ealth expert.  That's just an impression I have at this point.  I just want to put that on the record."

C. Analysis

Defendant points to the following as substantial evidence that he was incompetent: his comment that the prosecutor and defense counsel were brothers; defendant's decision to appear in jail clothing; defense counsel's comment that defendant refused to speak to him and he was starting to wonder if there were some section 1368 issues; defendant's comment that Osiris tricks us and the world is doomed; counsel's comment that defendant was beginning to decompensate mentally; defendant's hearing voices; and defendant's repeated requests for increased medication.  Defendant acknowledges that the trial court believed he was feigning or exaggerating his mental illness, but he contends the court was obligated to suspend proceedings in light of the evidence of incompetence.

We agree that the record contains evidence defendant was making bizarre statements and had sometimes refused to speak to counsel, but this was not enough to constitute substantial evidence of incompetence.  It is clear from the record the trial court believed defendant understood what was going on and comprehended the nature and purpose of the proceedings. The record amply supports the trial court's findings.  Defendant's statements and letters clearly demonstrated he was capable of comprehending the charges against him, understood the proceedings, and was able (when he chose) to cooperate with counsel.  Furthermore, the trial court was in the position to observe defendant's behavior and determine that he was manipulating the system.  The court did not abuse its discretion in refusing to suspend the proceedings under section 1368.

(Lodged Doc. 4 at 22-25.)

Generally, a person whose "mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Drope v. Missouri, 420 U.S. 162, 172 (1975). The test for competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960). An evidentiary hearing is constitutionally compelled at any time that there is substantial evidence that the defendant may be mentally incompetent to stand trial. DeKaplany v. Enmoto, 540 F.2d 975, 980-81 (9th Cir. 1976). "Evidence is substantial if it raises a reasonable doubt about the defendant's competency to stand trial." Id. at 981. However, the function of the trial court is not to determine if the defendant is competent to stand trial, but to decide whether "there is any evidence which, assuming its truth, raises a reasonable doubt about the defendant's competency" and to order an evidentiary hearing on the competency issue if such evidence appears. Id. at 981. Factors to consider in ascertaining a defendant's competence include evidence of irrational behavior, demeanor at trial, and any prior medical opinion on competence. See Drope, 420 U.S. at 180. "The state trial and appellate courts' findings that the evidence did not require a competency hearing under *Pate* are findings of fact to which [this court] must defer unless they are 'unreasonable' within the meaning of 28 U.S.C. § 2254(d)(2)." Torres v. Prunty, 223 F.3d 1103, 1105 (9th Cir. 2000).

Although Petitioner made some bizarre statements and refused to speak with counsel at certain times, after a review of the record, the Court finds the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Petitioner's communication with the trial court demonstrated that he was well aware of the legal proceedings that were taking place, and defense counsel acknowledged such. The mere fact that Petitioner was unwilling to communicate with his counsel does not demonstrate that he was incapable of doing so. Defense counsel's statement, questioning Petitioner's competence, does not demonstrate substantial evidence unequivocally to question Petitioner's competence. The trial court observed Petitioner repeatedly throughout the trial proceedings and

1  made the factual finding that it was "not convinced that [Petitioner's] actions [were] anything

2  more than an attempt to manipulate the court and the system.  I think he is playing up his mental

3  illness capacity or aspect because now we're in trial and I see it as my impression is a

4  malingering type situation here to make his appearance or to make his mental illness appear to be

5  much more serious than it really is for purposes of disrupting this proceeding."  (RT 184.)  The

6  judge's "ab[ility] to observe [Petitioner] in the context of the trial" allowed him "to gauge from

7  [Petitioner's] demeanor [that he] was able to cooperate with his attorney and to understand the

8  nature and object of the proceedings against him."  <u>Drope v. Missouri</u>, 420 U.S. at 181.  Under

9  these circumstances, the state court's determination of this issue was not contrary to, or an

10  unreasonable application of, clearly established Supreme Court precedent, nor an unreasonable

11  determination of the facts in light of the evidence.  28 U.S.C. § 2254.

12         2.    <u>Insufficient Evidence of Sanity at Time of Commitment Offense</u>

13        Petitioner contends there was insufficient evidence to prove he was sane at the time of the

14  commitment offense.  The Court of Appeal denied the claim stating, in pertinent part:

> The jury was not required to accept the experts' opinions in light of
> substantial evidence that defendant was aware of right and wrong on the night of
> the crimes.[fn] The evidence overwhelmingly demonstrated that defendant
> attempted to go undetected by driving without lights and by fleeing when
> homeowners turned on their outdoor lights.  He also attempted to escape capture
> by running from the brothers and then charging them with a weapon (apparently
> when he realized he could not leave his truck behind).  When Mark struggled with
> defendant, defendant cursed at him and threatened to cut him.  As soon as
> defendant got the truck to work, he backed up so fast that Mark labored to keep
> from falling.  After defendant left the vicinity, he turned his lights on, but when he
> entered the Fosters Freeze parking lot, he turned them off again.  When he saw
> Lopez, an officer with whom he was very familiar, he accelerated directly at him
> and narrowly missed the patrol vehicle before he sped out of the lot.  Even when
> he was approached by officers in the middle of the freeway, defendant refused to
> submit.  His flight and resistance strongly supported the inference he knew his
> conduct was wrongful and he did not want to get caught.
>
> FN6 The jury was instructed with CALCRIM No. 332, as follows:
> "Witnesses were allowed to testify as experts and to give opinions.  You
> must consider the opinion[s], but you are not required to accept them as
> true or correct.  The meaning and importance of any opinion are for you to
> decide.  In evaluating the believability of an expert witness, follow the
> instructions about the believability of a witness generally.  In addition,
> consider the expert's knowledge, skill, experience, training, and education,
> and the reasons the expert relied upon in reaching that opinion.  You must
> decide whether information on which the expert relied was true and
> accurate.  You may disregard any opinion that you find unbelievable,

1       unreasonable, or unsupported by the evidence."

2       Defendant himself stated that he knew it was wrong to steal.  And
3   although he said he only took what was his, the chain cutters he brought with him
    (and used) suggested he planned to steal.  Furthermore, defendant's memories of
    the night were self-servingly selective, and he repeatedly admitted he did not want
4   to go back to prison.

5       Although both experts opined that defendant was insane at the time of the
    crimes, as the experts admitted, their opinions were based in great part on what
6   defendant told them.  The jury was not required to accept defendant's statements
    as true. [fn] And defendant's blood levels of cocaine and opiate painkillers did not
7   constitute evidence of insanity.

8       FN7 The jury was instructed with CALCRIM No. 360, as follows: "Dr.
    Luis Elosa and Dr. Thomas Middleton testified that in reaching [their]
9   conclusions as ... expert witness[es], [they] considered statements made by the
    defendant.  You may consider those statements only to evaluate the expert[s']
10  opinion[s].  Do not consider those statements as proof that the information
    contained in the statements is true."

11
12      In sum, the record contains substantial evidence that defendant was able to
    appreciate the wrongfulness of his conduct at the time of his crimes- -in other
    words, that he was sane.
13

14  (Lodged Doc. 4 at 29-32.)

15      The law on insufficiency of the evidence claim is clearly established.  The United States

16  Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

17  federal court must determine whether, viewing the evidence and the inferences to be drawn from

18  it in the light most favorable to the prosecution, any rational trier of fact could find the essential

19  elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

20  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.  In

21  rendering its inquiry, this Court "must respect the province of the jury to determine the credibility

22  of the witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts

23  by assuming that the jury resolved all conflicts in a manner that supports the verdict."  Walters v.

24  Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

25      Although both experts opined that Petitioner was legally insane at the time of the

26  commitment offense, both based their opinions primarily on the statements presented by

27  Petitioner, including his false statement that he was not under the influence of cocaine at the time

28  of the offense.  Neither expert verified any of the information given to them by Petitioner.  Both

14

experts agreed Petitioner's cocaine use on the day of the offense may have impacted their

ultimate decision.  Dr. Velosa acknowledged that cocaine use produces delusions.  Moreover,

although both experts were aware that Petitioner had a criminal history, neither of them had any

of the details of the offenses.  Petitioner ignores the fact that both experts were impeached at trial

with their lack of information and/or reliance on false information, and the jury (as the sole fact-

finders) resolved any conflict among the evidence.  The Court of Appeal pointed out that the jury

was instructed that it must decide whether information on which the expert relied was true and

accurate.  Thus, the jury was not required to accept the experts' testimony and opinion, and there

was ample evidence to support the jury's finding of legal sanity based on Petitioner's conduct

during the commitment offense.

> 3.    Invalidity of No Contest Plea Based on Mental Instability

Petitioner claims that the trial court abused its discretion when it denied his motion to

withdraw his plea because he was not properly medicated and was misadvised by defense

counsel and the trial court as to the charges and defenses available to him.

On July 29, 2008, Petitioner withdrew his not guilty plea and entered a no contest plea as

to counts 2 through 5.  (RT 51-53; CT 146.)  Petitioner also admitted all of the special

allegations.  (Id.)  Pursuant to his plea, Petitioner agreed to a sentence of five years and four

months.  (Id.)

Just after Petitioner was found legally sane by the jury, Petitioner requested to file a

motion to withdraw his plea on July 31, 2008.  (RT 422-423; CT 151.)  On October 10, 2008,

Petitioner filed a handwritten motion to withdraw his plea.  (CT 198-205.)  Petitioner filed a

second written motion on October 14, 2008, in which he claimed he was not competent to make

the plea.  (CT 213-214.)  On November 12, 2008, Petitioner, through new counsel, filed a motion

to withdraw his plea claiming he "did not understand the consequences of the no contest plea."

(CT 218-220.)  The trial court heard the motion that same day.  (CT 243-244.)

The prosecutor opposed Petitioner's request to withdraw his plea. (CT 246.)  The trial

court denied the motion.  (CT 246-247.)

The Court of Appeal found the trial court did not abuse its discretion and denied the

claim stating, in pertinent part:

///

### 1. Facts

At the plea hearing on July 29, 2008, defendant answered affirmatively when the court asked if he understood what they were doing there, that he would serve five years four months if the jury found him sane, that he could be committed to a state hospital for up to five years four months if the jury found him insane, that his plea meant he was in violation of probation on his previous case, that the pending trial would address only whether he was sane at the time of the crimes, and that he would not get a trial on the issue of guilt or a hearing on the probation violation. The court then listed defendant's rights and asked whether he waived each of those rights. Defendant again answered affirmatively each time. After taking the plea, the court stated: "The court accepts the no contest plea. Finds the defendant made a knowing, voluntary, expressed, explicit and understanding waiver of his constitutional rights. The court further finds that his pleas are freely and voluntarily made." Defense counsel said he had discussed the matter with defendant and had advised him of the nature of the charges, the consequences of his plea and any possible defenses he might have. Defense counsel said he believed defendant understood those matters. The court found that defendant understood the nature of the charges and the consequences of the plea. The court also found a factual basis for the plea.

On October 10, 2008, defendant filed a handwritten motion to vacate his plea (and for a new sanity trial). He argued that he was not rational when he made the plea because his mental illness was not being treated adequately. He also asserted that his plea was the result of defense counsel's ineffective assistance of counsel.

On November 12, 2008, defendant's new counsel filed a motion to withdraw the plea on the ground that defendant did not understand the consequences of the plea.

On November 13, 2008, the court heard and denied the motion. Defendant explained that he was intentionally under medicated by the district attorney's office, the sheriff's department, and the mental health team since he had been in custody.

The court stated:

"[Defendant] it appears to me that you, you have complaints about everybody. There's a conspiracy by the DA's Office. There's a vendetta by the Mental Health people to make sure you don't get your proper medication. There's your complaints about [defense counsel] who didn't do his job although he presented two doctors on your behalf that testified you were both [sic] insane. It was the jury's finding of your acts that in the court's mind convinced them of your sanity at the time of the offenses as opposed to the doctor[s'] testimony. Quite frankly I thought [defense counsel] did an excellent job in presenting your case on the issue of sanity.

"It's interesting because I had reviewed your motions and my notes or my impressions are exactly the same as [the prosecutor's]. Your motion seems very

coherent and they make sense to me which is exactly the same words that [the prosecutor] used and I had written that down before [he] even made his comments, so your motion to vacate the plea, your motion for a new trial, your motion to withdraw the plea.  Those are all denied."

2. Analysis

Although the record shows that defendant complained repeatedly about his medication and his inability to get a higher dosage, the trial court believed defendant understood what was going on, was exaggerating his mental illness for his own benefit, and was engaging in wholesale complaining.  Substantial evidence supports these findings.  The jail personnel examined defendant and verified that he was being properly medicated.  He was clearly able to research the law, discuss the case, and understand the proceedings.  He submitted lengthy, comprehensible handwritten pleas. [sic]

Accordingly, the record supports the conclusions that defendant was competent when he pled and that he made a knowing and voluntary plea.  Defendant has not shown that his mental condition or lack of medication overcame his exercise of free will.  The trial court did not abuse its discretion in denying the motion on this ground.

(Lodged Doc. 4 at 32-35.)

A plea of guilty is constitutionally valid only to the extent it is "voluntary" and "intelligent."  Brady v. United States, 397 U.S. 742, 748 (1970).  A plea is voluntary and intelligent if Petitioner was competent to enter into the plea and did so knowingly and voluntarily.  Godinez v. Moran, 509 U.S. 389, 401 (1993).

The jury found Petitioner to be legally sane at the time of the offenses.  Consequently, Petitioner was sentenced to five years and four months imprisonment.  The trial court adequately advised Petitioner of the consequences of his plea if found sane by the jury.  There was a full and complete colloquy between the trial court and Petitioner at the time he entered his plea.  Defense counsel declared that he had discussed at long length the possible approaches to his case.  (RT 46-47.)  Counsel then stated that Petitioner was willing to enter a no contest plea to Counts 2 through 5, based on the court's indicated sentence of five years and four months.  (RT 47.) Petitioner acknowledged that he wished to enter a plea of no contest and if found sane by the jury he would go to prison for five years and four months.  (Id.)  Although Petitioner claims his plea was not voluntary because he was mentally incompetent, at the time of the plea, both the trial court and Petitioner's counsel confirmed Petitioner fully understood the nature of the charges and the consequences of the plea.  (RT 53-54.)  Furthermore, the appellate court properly noted that

1   Petitioner's legal knowledge displayed by his motions filed with the trial court demonstrated his

2   competency at the time of his plea.  Moreover, at the time of entering his no contest plea,

3   Petitioner did not express doubt as to his own competency.  Even if counsel misadvised him that

4   he could be convicted of both theft and receiving stolen property, Petitioner has not established

5   that he would have not entered into the plea bargain had he been properly advised.  Pursuant to

6   the plea, Petitioner agreed to a state prison term of five years and four months.  Despite any error,

7   Petitioner still received the sentence to which he agreed.  Furthermore, Petitioner received a far

8   less sentence than had he gone to trial and been convicted of all the crimes.  (See e.g. RT 40-42;

9   CT 97-109.)  Based on the circumstances surrounding the entry of Petitioner's plea, the appellate

10  court's findings on this claim was not contrary to, or an unreasonable application of, clearly

11  established United States Supreme Court precedent, nor an unreasonable determination of the

12  facts in light of the evidence.

13  D.   Ineffective Assistance of Counsel Regarding Elements of Grand Theft

14       Petitioner contends that defense counsel was ineffective for failing to inquire as to

15  whether the stolen items amounted to more than $400, as required under state law for a

16  conviction of grand theft.

17       The law governing ineffective assistance of counsel claims is clearly established for the

18  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,

19  151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

20  assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

21  668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

22  the petitioner must show that counsel's performance was deficient, requiring a showing that

23  counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

24  the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

25  representation fell below an objective standard of reasonableness, and must identify counsel's

26  alleged acts or omissions that were not the result of reasonable professional judgment

27  considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

28  (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court

indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. <u>Strickland</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. <u>Strickland</u>, 466 U.S. at 688.  The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. <u>Id.</u>; <u>Quintero-Barraza</u>, 78 F.3d at 1345; <u>United States v. Palomba</u>, 31 F.3d 1356, 1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. <u>Strickland</u>, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.  Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of <u>Williams v. Taylor</u>, 529 U.S. 362 (2000).  <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (2000).

Furthermore, where, as here, a petitioner raises the claim of ineffective assistance of counsel in the context of a guilty plea, he must show that (1) his counsel failed to provide reasonable competent advice, and that (2) there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. <u>Hill v. Lockhart</u>, 474 U.S. 52, 58-59 (1985).

In this case, Petitioner has not demonstrated that counsel was ineffective or that he was prejudiced by any of the alleged errors.  Petitioner acknowledges that he was aware of counsel's alleged error during the July 29, 2008, Marsden hearing, which was prior to the time he entered his plea of no contest.  Petitioner nevertheless entered into the no contest plea.  Because Petitioner did so, the elements of the crime became irrelevant and there was no reason for counsel to proceed with evidence to refute the elements of the crime.  Thus, counsel could not

1  have been ineffective in this instance.  Moreover, Petitioner could not have been prejudiced by

2  counsel's alleged inaction.  Consequently, Petitioner has not satisfied either prong of <u>Strickland</u>,

3  and the claim must be denied.

4  E.    <u>Ineffective Assistance of Counsel Relating to Elements of Reckless Driving</u>

5          Petitioner contends that the offense of reckless driving "was never established . . . by the

6  law or the evidence. . . ."  Petitioner appears to be challenging the officer's testimony regarding

7  his reckless driving and it appears he claims counsel was ineffective for failing to investigate the

8  officer's personnel file.

9          Applying the <u>Strickland</u> standard set forth above, because Petitioner voluntarily pled no

10 contest, there was no reason for counsel to contest and disprove the elements of reckless driving.

11 Furthermore, Petitioner cannot demonstrate prejudice as he voluntarily pled no contest knowing

12 the factual circumstances of his case.[6]

13 F.    <u>Ineffective Assistance Counsel Regarding Theft and Receipt of Same Property</u>

14         Petitioner claims he was misadvised regarding the possibility of being convicted of

15 stealing and receiving the same property.  On direct appeal, Petitioner presented this claim as a

16 basis for which he believed he should have been allowed to withdraw his no contest plea.[7]

17         The Court of Appeal denied the claim stating the following:

18             We agree that defendant was misadvised by both the trial court and
         defense counsel after defendant correctly stated that according to the Penal Code
19       he could not be convicted of both stealing and receiving the same property.  (§
         496, subd. (a) ["no person may be convicted both pursuant to this section and of
20       the theft of the same property"].)  The court told defendant he could in fact be
         convicted of both crimes, but he could not be punished for both.  Defense counsel
21       agreed.

22             Assuming the misadvisement in this case constituted ineffective assistance
         of counsel, we nevertheless see no prejudice to defendant.  (*See People v. Johnson*
23       (1995) 36 Cal.App.4th 1351, 1357-1358 [counsel's erroneous advice on

24  ─────────────────────

25         [6] Petitioner does not indicate when he learned of the personal information about Officer Lopez which he
    alleges in his petition, nor does he indicate that the information would have been relevant to disproving the elements
26  of reckless driving.

27         [7] Petitioner presented this claim to the Court of Appeal in relation to his claim that he should have been
    allowed to withdraw his no contest plea because of counsel's alleged ineffective assistance for misadvising him.  The
28  Court of Appeal addressed the issue by determining whether or not counsel was ineffective.  Thus, there is a
    reasoned decision addressing the merits of this claim.

sentencing exposure may violate a defendant's right to effective assistance of counsel].)  Although defendant was misadvised and pled no contest to a crime for which he should not have been convicted, he does not establish a reasonable probability he would not have accepted the plea had he been properly advised. Indeed, the record supports the contrary conclusion because the court had informed defendant that even if he was convicted of both crimes, he could not be punished for both.  Defendant's sentencing exposure on either of those counts was the midterm of four years and the aggregate potential exposure on all counts greatly exceeded the five year four month plea bargain.  Defendant gives us no reason to believe he would not have accepted the bargain had he known he could not be convicted of both counts 2 and 3.  His self-serving statement that he would not have accepted the bargain is not enough without objective corroboration.

Lastly, any error in the court's denial of the motion to withdraw the plea was not prejudicial because defendant has retained the benefit of his bargain. Defendant agreed to a term of five years four months, and although he was improperly convicted (and sentenced) on both counts 2 and 3, the trial court ultimately restructured the sentencing (staying the sentence on count 3), and we will now strike the conviction on that count.

(Lodged Doc. 4 at 37-38.)

As fully explained by the appellate court, even if counsel was ineffective for failing to advise Petitioner he could not have been convicted of both theft and receiving the same property, there was no prejudice as a result.  Petitioner's sentence exposure remained the same under the plea whether or not he was misadvised.  The trial court clearly advised Petitioner he would not be sentenced on both counts if convicted.  Accordingly, Petitioner is not entitled to relief.

G.    Absence When Abstract of Judgement Amended

Petitioner contends that the trial court erred in amending the abstract of judgment in his absence.

Petitioner did not present this claim to the state court.  Therefore, the claim is unexhausted and Petitioner is not entitled to relief.  This Court can review the merits of an unexhausted claim, if it is perfectly clear the claim is not colorable.  Cassett v. Stewart, 406 F.3d 614, 623-624 (9th Cir. 2005).

In this instance, the claim is not colorable.  As an initial matter, the claim is based on the state court's interpretation of state law with regard to modification of a document containing a clerical claim.  A claim based on a violation of state claim is not cognizable in a federal habeas corpus proceeding.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (holding that a federal

1   writ is not available for alleged error in the interpretation or application of state law); Park v.

2   California, 202 F.3d 1146, 1149 (9th Cir. 2000) (same).  Under California law, "[a]n abstract of

3   judgment is not the judgment of conviction; it does not control if different from the trial court's

4   oral judgment and may not add to or modify the judgment it purports to digest or summarize."

5   People v. Mitchell, 26 Cal.4th 181, 190 (2001).  Preparation of the abstract of criminal judgment

6   in California is a clerical, not a judicial function.  People v. Rodriguez, 152 Cal.App.3d 289, 299

7   (1984).  Even assuming it raises a federal question, it is without merit.  It is routine for appellate

8   courts to grant the State's request to correct errors in the abstract of judgment.  People v. Hong,

9   64 Cal.App.4th 1071, 1075 (1998).  Even assuming the claim raises a federal question, it is clear

10   that Petitioner was not sentenced beyond the sentence imposed in open court in his presence.

11   Thus, there is no basis for relief on this claim and it must be denied.

12   H.      Certificate of Appealability

13          A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

14   district court's denial of his petition, and an appeal is only allowed in certain circumstances.

15   Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

16   whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

17           (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
        district judge, the final order shall be subject to review, on appeal, by the court
18        of appeals for the circuit in which the proceeding is held.

19           (b) There shall be no right of appeal from a final order in a proceeding to test the
        validity of a warrant to remove to another district or place for commitment or trial
20        a person charged with a criminal offense against the United States, or to test the
        validity of such person's detention pending removal proceedings.

21
        (c)      (1) Unless a circuit justice or judge issues a certificate of appealability, an
22            appeal may not be taken to the court of appeals from–

23                  (A) the final order in a habeas corpus proceeding in which the
            detention complained of arises out of process issued by a State
24            court; or

25                  (B) the final order in a proceeding under section 2255.

26           (2) A certificate of appealability may issue under paragraph (1) only if the
        applicant has made a substantial showing of the denial of a constitutional right.

27
           (3) The certificate of appealability under paragraph (1) shall indicate which
28        specific issue or issues satisfy the showing required by paragraph (2).

22

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1.    The instant petition for writ of habeas corpus is DENIED;

2.    The Clerk of Court is directed to enter judgment in favor of Respondent; and

3.    The Court declines to issue a certificate of appealability.

IT IS SO ORDERED.

**Dated:    February 25, 2011**                  **/s/ Sandra M. Snyder**
UNITED STATES MAGISTRATE JUDGE